**WICHITA COUNTY, Texas, Appellant,**

**v.**

**Allen HART and Ernie Williams, Appellees.**

No. 2–97–366–CV.

Court of Appeals of Texas, Fort Worth.

March 18, 1999.

Rehearing Overruled April 15, 1999.

**4**

Hogan, Dubose & Townsend, L.L.P., Roger Townsend, Banner, Briley & White, Steve Briley, The Fillmore Law Firm, P.C., H. Dustin Fillmore, Houston, for Appellant.

Mills, Millar & Cullar, L.L.P., R. John Cullar, Waco, for Appellee.

PANEL B: DAUPHINOT, BRIGHAM, and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

This appeal arises out of a whistleblower suit, in which Allen Hart and Ernie Williams sued Wichita County for wrongful termination under the Whistleblower Act. The jury found against Wichita County, and awarded Hart and Williams $1,341,142. Wichita County asserts two points on appeal, contending that Hart and Williams did not act in good faith when they reported suspected criminal conduct by the Sheriff's office, and that the trial court erred by excluding expert testimony from a district attorney. Because we find that Hart and Williams did not act in good faith when they reported the alleged criminal conduct, we reverse the trial court's judgment and render judgment that Hart and Williams recover nothing against Wichita County.

## BACKGROUND

Hart and Williams were both employed as deputy sheriffs in the Wichita County Sheriff's Department ("WCSD") since January 1977.[1] The WCSD requires bail bondsmen to post security to protect the County in the event of a bond forfeiture. For the past 20 years or more, bondsmen have been allowed to meet this requirement by filing a deed of property with the WCSD. The deeds were usually kept in the desk or files of Marilyn Fulton, office manager for the WCSD. Fulton was in charge of bail bonds and had served as the sheriff's representative on the Bail Bond Board, which licenses bondsmen, since its inception in 1982.

In 1986, the then-sheriff resigned, and Hart and Williams both took active roles in supporting the appointment of Tom Callahan as the new sheriff. Callahan was appointed, and Williams' wife later served as Callahan's campaign treasurer during his first election for sheriff in 1988. Sheriff Callahan promoted Williams to sergeant in the patrol division in 1986. In 1988, Sheriff Callahan appointed then-Captain Hart to the newly created position of major. In his new position, Hart was subordinate only to Sheriff Callahan and the chief deputy and was responsible for all the day-to-day operations of the WCSD, including all operational decisions and management of the department's $3.5 million-per-year budget. Before February 1989, neither Hart nor Williams had ever experienced any form of disciplinary action related to their employment in the WCSD.

In March 1987, Sheriff Callahan requested updated security from bondsmen Roger Crampton, Barbara Crampton, Holly Crampton Estrada, and Robert Estrada. They signed a deed transferring specific real property owned by Roger Crampton and Barbara Crampton to "Thomas J. Callahan, Sheriff of Wichita County, Texas, and his successors in office. . . ."

---

1. Ernie Williams was appointed by the Wichita County Commissioners Court to serve the unexpired term of a county constable in 1978. Following his service as constable, Williams returned to WCSD.

In May 1988, a judgment for about $7,300 was rendered in Young County against Barbara Crampton, Holly Crampton Estrada, Robert Estrada, and the partnership of Crampton, Crampton & Estrada, in favor of Graham National Bank. The judgment was abstracted and recorded in Wichita County in July 1988. A writ of execution was issued and sent to the WCSD. Before the judgment could be satisfied, two of the judgment debtors, Holly Crampton Estrada and Robert Estrada, filed for bankruptcy, which stayed execution on the entire judgment. The first writ of execution was then returned *nulla bona.*

About six weeks after the Estradas filed for bankruptcy, Marilyn Fulton filed the deed signed by Roger Crampton, Barbara Crampton, Holly Crampton Estrada, and Robert Estrada that had been in the WCSD's possession since March 1987. Fulton wanted all potential creditors of the Cramptons and Estradas to have notice that the real property already belonged to Wichita County.

In February 1989, the bankruptcy stay was lifted only as to Barbara Crampton. Then a second writ of execution was issued solely against her. On February 22, 1989, Sgt. Melvin Scott, head of the WCSD'S civil process division, told Hart that he had "lost all respect for the Sheriff," because the filed deed conveying the property to the Sheriff had made the property unavailable for levy under the second writ of execution.

The next day, Hart learned that a deputy was selling handguns that had been confiscated by the WCSD's directly to a pawnbroker without the formality of a sheriff's sale. The deputy told Hart that Sheriff Callahan had instructed him to sell the guns that way. Hart immediately stopped the sale.

On February 24, 1989, Sheriff Callahan canceled all of Hart's authority over the operations and personnel of the WCSD, and reassigned Hart as the chief deputy's assistant.[2] However, Hart suffered no loss in pay and he remained at the rank of major.

On March 28, 1989, Barbara Crampton satisfied Graham National Bank's judgment in full by cashier's checks. About the same time, Hart and Williams reported to the chief investigator of the Wichita County District Attorney's Office, Mike Cross, that they believed that the WCSD had violated the law by deeding the real property to the sheriff.[3] Cross began an investigation based on Hart's and Williams' report. On April 13, 1989, the second writ of execution was returned bearing a notation that the judgment had been paid in full.

On April 16, 1989, Williams reported to the FBI that he suspected federal crimes involving the WCSD office and tax liens.[4] On April 21, Hart and Williams were demoted for refusing to allow two female deputies to take part in a training exercise. Three days later, Hart and Williams went secretly to Young County to inspect the court records of the $7,300 judgment against the Cramptons and Estradas.

On May 1, 1989, Cross questioned Sheriff Callahan, advising the him of his *Miranda* rights,[5] and informed him of the investigation that was a result of Hart's and Williams' report. This was the first time Sheriff Callahan knew of the investigation. After Cross interviewed Sheriff Callahan and Marilyn Fulton, he concluded that neither the sheriff nor Fulton had violated the law. Wichita County District Attorney Barry Macha learned of the investigation on May 1, 1989,

---

2. Sheriff Callahan testified that the reassignment was due to a series of problems with Hart that began shortly after being promoted to major.

3. Hart and Williams testified that they did not at any time believe that Sheriff Callahan himself had violated the law. They stated that they had accused only the office manager, Marilyn Fulton. Although WCSD policy required that any suspicion of wrongdoing by its employees be reported first to Sheriff Callahan, Hart testified that he was reluctant to go to Sheriff Callahan because

he had been stripped of all authority after stopping the gun sale, and he did not feel it was proper for the WCSD to investigate itself.

4. FBI Special Agent Lee Hale told Williams that he would investigate the reported violations. Hale met with Cross about Williams' report, but there is nothing more in the record about that.

5. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and also concluded that there was no criminal conduct by the sheriff or Fulton.

Sheriff Callahan immediately fired Hart and Williams for conducting an unauthorized investigation against WCSD personnel.[6] In letters to Hart and Williams dated May 10, 1989, Sheriff Callahan explained that the terminations were partly due to a history of problems that Hart and Williams had caused within the WCSD and that the improper investigations were the final straw.

## GOOD FAITH

The County asserts in its first point that there is no evidence, and alternatively insufficient evidence, to support the jury's finding of good faith because Hart's and Williams' report to authorities that a violation of the law had occurred was unreasonable in light of their training and experience.

The Whistleblower Act prohibits the suspension or termination of "a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE ANN. § 554.002 (Vernon Supp.1998). "Good faith," as used in the Whistleblower Act, means that (1) the employee believed that the conduct reported was a violation of law, and (2) the employee's belief was reasonable in light of the employee's training and experience. See Wichita County v. Hart, 917 S.W.2d 779, 784–85 (Tex.1996). The first prong of the definition is a subjective analysis that requires the employee to have believed that he was reporting an actual violation of law. See id. The second prong of the definition applies an objective analysis. It requires the factfinder to determine whether a reasonably prudent employee in similar circumstances, having had the same training and experience as the plaintiff employee, would have believed that the facts as reported were a violation of law. See id.

The "good faith" standard, however, is not the same for every public employee. The objective reasonableness of the employ-ee's belief must be viewed in light of his training and experience. Consequently, those who are trained in law enforcement and investigation are held to a higher burden in establishing the reasonableness of their belief of criminal law violations. See id. at 785. ("A police officer, for example, may have had far more exposure and experience in determining whether an action violates the law than a teacher or file clerk."); Harris County Precinct Four Constable Dep't v. Grabowski, 922 S.W.2d 954, 956 (Tex.1996) ("Thus, the reasonableness of a peace officer's belief that a law has been violated will be examined more closely than will the belief of one in another, non-law enforcement profession.").

The County challenges the jury's finding of "good faith" under the second prong. It is the County's contention that the evidence is legally and factually insufficient to support the jury's finding that Hart and Williams reasonably believed in light of their training and experience that a law had been violated.

## STANDARDS OF REVIEW

When a party without the burden of proof on a fact issue challenges the legal sufficiency of the evidence supporting an adverse fact finding, we review the record under a "no-evidence" standard. See Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex.1983); Marshall v. Superior Heat Treating Co., 826 S.W.2d 197, 200 (Tex.App.—Fort Worth 1992, no writ.). In determining a "no-evidence" point, we are to consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998); Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997), cert. denied, —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient

---

6. WCSD's policies required that suspicion of wrongdoing by its employees be reported first to Sheriff Callahan.

as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Formosa Plastics Corp.*, 960 S.W.2d at 48; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996).

A "no-evidence" point may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Merrell Dow Pharm.*, 953 S.W.2d at 711 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *See Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998).

In factual insufficiency cases, our opinion must detail the evidence relevant to the point in consideration and clearly state why the finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, why it shocks the conscience, or why it clearly demonstrates bias. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g). Further, our opinion must state in what regard the contrary evidence greatly outweighs the evidence in support of the finding. *See*

7. *See* Act of May 27, 1983, 68th Leg., R.S., ch 558, § 7, 1983 Tex. Gen. Laws 3237, 3241–42 (amended 1993) (current version at TEX. PENAL CODE ANN. § 39.02 (Vernon 1998)); Act of April 13, 1987, 70th Leg., R.S., ch. 30, § 1, 1987 Tex.

*id.; see also Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986).

## BASIS OF "BELIEFS"

The record reveals that at the time that Hart and Williams reported their beliefs to Cross, they had reviewed both writs of execution, a letter from Graham National Bank concerning the writ of execution, and the notes prepared by the County's civil process server concerning the property subject to seizure by the 1988 writ of execution. They knew that the transfer of the property into the sheriff's name (in his official capacity) had prevented a levy on the real property to satisfy the second writ of execution; they knew that the deed transferring the property was filed after the *nulla bona* return of the first writ of execution; and they knew that Holly Crampton Estrada and Robert Estrada had filed bankruptcy. They also knew that Marilyn Fulton had instructed employees of the WCSD civil process office to inform her if any further writs of execution were received against the Cramptons and Estradas. Finally, they knew that no bond forfeitures had occurred in 1988 or 1989 to warrant the transfer of the property to the sheriff.

Hart and Williams testified at trial that, based on that knowledge, they believed Marilyn Fulton had violated sections 39.01 and 39.03 of the Texas Penal Code.[7] We will discuss these separately.

### 39.01 Abuse of Official Capacity

Hart and Williams testified that they believed that Marilyn Fulton's filing of the deed on December 7, 1988, constituted an abuse of official capacity. The County argues, however, that their belief is unreasonable because there was no evidence that Fulton intended to benefit personally or harm Graham National Bank by filing the deed, nor was there evidence that Fulton had misapplied property.

Former section 39.01 provided:

Gen. Laws 64 (amended 1993) (current version at TEX. PENAL CODE ANN. § 39.06 (Vernon 1998)). In this opinion, we refer to these statutes as former section 39.01 and former section 39.03.

(a) A public servant commits an offense if, with intent to obtain a benefit or with intent to harm another, he intentionally or knowingly:

(1) violates a law relating to his office or employment; or

(2) misapplies any thing of value belonging to the government that has come into his custody or possession by virtue of his office or employment.

While Hart conceded at trial that Fulton had not tried to benefit personally from filing the deed, Williams speculated that perhaps Fulton was trying to benefit Sheriff Callahan or the Cramptons and Estradas. However, even if Williams' speculation was true, former section 39.01 requires that the public employee intend to obtain a benefit for him or herself, not confer a benefit on someone else. Hart conjectured that Fulton had intended to harm Graham National Bank by preventing it from collecting its judgment against Barbara Crampton, Holly Crampton Estrada, Robert Estrada and the law firm. However, neither Hart nor Williams offered any evidence to establish that Fulton intended to harm Graham National Bank. Williams even conceded that they did not at any time attempt to gather any evidence.[8]

Similarly, they could not point to evidence that Fulton violated a law relating to her office or that she misapplied anything belonging to the government. At trial, Hart agreed that Fulton had not violated any law relating to her office, but asserted that Fulton had misapplied property belonging to the government by filing the deed. However, at trial, Hart could not point to any law or language in the deed that prohibited Fulton from filing the deed. Nor could Hart explain how by filing the deed in a public record Fulton "misapplied" the deed. The deed simply conveyed real property to the Sheriff *and his successors in office* to be used for security for bail bonds.[9]

### 39.03 Misuse of Official Information

The other penal code section alleged by Hart and Williams to have been violated was former penal code section 39.03. It provides:

---

8. During the cross-examination of Williams, the following transpired:

[The County]: So you have to know her intent; is that correct?
[Hart]: It would help.
[The County]: Well, what did you do to find out her intent before you went down and accused her of felony?
[Hart]: Nothing.
. . . .
[The County]: To determine—To determine her intent, could you have gone to her and asked her about it?
[Hart]: Yes, sir, I could have.
[The County]: But you didn't do that, did you?
[Hart]: No, sir, I didn't.
. . . .
[The County]: So there is no reason why you didn't go find out what her intent was, an element that you think is necessary to know before you go out and accuse somebody of a crime; is that correct? Did I summarize that accurately?
[Hart]: Yes, sir.

9. During the cross-examination of Hart, the following exchange occurred:

[The County]: Okay. It's to the County and with the letter that comes with it, it says there is our security so how do you—how do you claim or how do you understand that filing something that you already have, how do you—how do you come with the idea that when you file it and have misapplied something that already belongs to you by the deed?
[Hart]: The condition in which the deed was given—was to be held.
[The County]: Now, how do you know that?
[Hart]: That's what the letter said.
. . . .
[The County]: Okay. Held where?
[Hart]: Well, the way she just held them in her office in a filing cabinet.
[The County]: Okay. Well, is there anything in the deed that says you can't file this to protect your security interest in this property?
[Hart]: No, not in this deed, that's correct.
[The County]: Okay. Well, in any deed that you have seen there, does it say that you cannot file a deed that's given for security to protect your security interest and make it of record?
[Hart]: There is nothing in the deeds, no sir.
[The County]: Well, did you ever talk to Roger Crampton?
. . . .
[Hart]: No, I did not.
[The County]: Did you ever talk to Holly Crampton?
[Hart]: No.
[The County]: Did you ever talk to Barbara Crampton?
[Hart]: No.
[The County]: Did you ever talk to Bobby Estrada?
[Hart]: No, I did not.

(a) A public servant commits an offense if, in reliance on information to which he has access in his official capacity and which has not been made public, he:

(1) acquires or aids another to acquire a pecuniary interest in any property, transaction, or enterprise that may be affected by the information;

Despite the fact that the deed plainly conveys the real property to the sheriff in his official capacity, not personally, Hart testified that he believed that Fulton had used her official capacity to acquire knowledge of the second writ of execution so that she could file the deed before its execution to benefit the sheriff personally. Hart testified that he had formed his belief that because he had heard that Fulton had told co-workers that, if "anything" arrived from Young County to bring it to her attention and because she had the deed in her possession. Hart explained that he interpreted her alleged comment to co-workers to mean that she must have known that there would be a second writ of execution from Young County. However, he could not explain how Fulton would have known that a second writ was coming, and admitted he did not even know whether she had made the alleged remarks to other employees before or after the first writ of execution. Moreover, both he and Williams conceded that the issuance of writs of execution was public information. Neither Hart nor Williams could point to any information that Fulton may have known because of her official capacity that was not public information.[10] Fulton testified that she did not have any advance knowledge of the second writ of execution. The evidence further revealed that Fulton often instructed her co-workers to show her a writ of execution as soon as it arrived, especially when bondsmen and attorneys were involved.

Hart testified that he thought Fulton was using the information to benefit Sheriff Callahan by helping him to obtain property for his own gain. However, the deed conveyed the property to Sheriff Callahan in his official capacity. It states that the property is being conveyed to "Thomas J. Callahan, *Sheriff of Wichita County, Texas, and his successors in office.* . . ." Williams, on the other hand, speculated at trial that Fulton may have been trying to benefit the County, or possibly the Cramptons and Estradas. His theory was, likewise, unsupported by the evidence. The deed had been executed, and thus, the conveyance became effective in March 1987. Fulton's filing the deed in December 1988 could not have caused the County to "acquire" an interest in the property; it only put others on notice of the interest the County *already had acquired* some 21 months earlier. *See Bell v. Smith,* 532 S.W.2d 680, 685 (Tex.Civ.App.—Fort Worth 1976, no writ). Moreover, nothing on the face of the deed indicated any benefit to the Cramptons or Estradas, as they were the parties transferring the property.

Despite the lack of evidence, Hart and Williams maintain that in light of their training and experience and based on their knowledge at the time they reported their suspicions to Cross, they reasonably believed that Marilyn Fulton's conduct constituted an abuse of official capacity and/or misuse of official information.[11] They contend that neither one has had any training in or knowledge of real estate law, nor have they ever had an occasion to investigate or charge anyone with abuse of official capacity. In essence, Hart and Williams argue that they knew enough to be reasonably suspicious, but

---

10. During the cross-examination of Hart, the following transpired:

[The County]: No, I'm not asking you that. I'm asking you what information did you have in mind when you assumed that as you previously testified that this statute had been violated? What is the information that fits these two—the criteria that you had in mind? What was it?

[Hart]: I can't tell you what, just that they had to be on the lookout for anything coming from Young County and I took that to mean she must have known something was coming.

I don't know that she did but why would she make that statement, I don't know.

11. Both Hart and Williams were deputy sheriffs and certified as peace officers by the Texas Commission on Law Enforcement Education. Hart graduated from high school and had withdrawn from college during his first year. Williams did not complete high school, but received a G.E.D. Neither had ever been an investigator in their careers as peace officers, nor had they had any training in or knowledge of real estate law.

not enough to reasonably know that no actual law had been violated.

In *Hart*, the Supreme Court made clear that law enforcement officers face a heavier burden in establishing the reasonableness of their belief that a law has been violated. *See Hart*, 917 S.W.2d at 785. The Supreme Court explained that those who have been trained in investigation and law enforcement have far more exposure and experience in determining whether an action violates the law, and thus, the reasonableness of their belief that a law has been violated will be examined more closely than will the beliefs of non-law enforcement employees. *See id.*; *Grabowski*, 922 S.W.2d at 956. Applying that rationale in *Grabowski*, the Supreme Court concluded that a deputy constable's belief that a law was violated was unreasonable in light of his experience and training because he presented no evidence of a law he believed had been violated other than the department's internal policies, and openly admitted that he could not think of a law that had been violated. *See Grabowski*, 922 S.W.2d at 956.

■ Although Hart and Williams speculated that two penal code sections may have been violated, that *alone* is not enough to satisfy their burden under the second prong of the good faith definition. Law enforcement officers are charged with the enforcement of our laws and investigating alleged violations of those laws. It is not enough to simply point to a penal statute and allege a violation. A law enforcement officer must be able to also point to some evidence establishing the elements of the alleged offense. Hart even conceded that before a police officer charges or accuses a person of committing an offense, he should have evidence establishing each element of that offense; otherwise, there is no case.[12]

---

12. During the County's cross-examination of Hart, the following transpired:

[The County]: Okay. Now, let me talk to you a moment if I may about criminal investigation.... In a criminal investigation and that's really your expertise, is it not?

[Hart]: I wouldn't call it my expertise, no, sir.

[The County]: Well, you were supervising people who claimed to have that expertise in the sheriff's office, didn't you?

[Hart]: I was supervising the criminal investigation division, yes.

[The County]: And of course going out and make a case, you have some knowledge of how to investigate the vie [sic] laying of the law, don't you as a sheriff's deputy with all your training and certifications and that sort of thing?

[Hart]: Yes.

[The County]: Okay. Now, follow me and see if I'm not right about this. Before you can accuse someone or charge someone with a violation of the law, number one, you need to have some idea as to the law that they violate?

[Hart]: Yes.

....

[The County]: For instance, let's use something that's very simple. You have investigated theft, haven't you?

[Hart]: Yes.

[The County]: All right, and the elements of theft, just to use that for an illustration, is that the accused, that's number one, has taken the property of another person without that other person's knowledge or consent and has appropriated that property to his own use and benefit. Now aren't those elements of theft?

[Hart]: That sounds right, yes, sir.

[The County]: Okay. So there is about six elements there that if you [are] going to make a case, let me—I don't mean to belabor this but—so the accused, you've got to have an accused, and have got to have property that's got to be taken without the owner's knowledge or consent and then the accused appropriates the property to his own use and benefit. You've got about one [,] two, three, four maybe five elements of the offense of theft; is that correct? Can you think of any element that I have left out?

[Hart]: No, I'm not sure because I don't have a penal code to sit here and read it to you.

[The County]: Well, that's your best recollection and for illustrative purposes that what I'm saying is correct, isn't it?

[Hart]: As far as I know, yes.

[The County]: Okay.

[Hart]: Without reading the statute.

[The County]: Sure, but if you're going to make a case on somebody for theft, you have got to show that this old boy or whoever it was, took somebody's property and they took it without that owner's knowledge and consent and used that property to his own use and benefits. Those are the elements that you would have to prove to make out a classic case of theft?

[Hart]: Yes, sir.

[The County]: All right. Now, of course if you found out that the property didn't belong to the owner, that wouldn't be theft, would it? The person you thought that owned it, if he actually didn't own it but it actually belonged to the accused, that wouldn't be theft, would it?

After carefully reviewing the record, we conclude that the evidence is legally and factually insufficient to support the jury's finding that Hart's and Williams' belief that former sections 39.01 and 39.03 were violated was reasonable. Neither Hart nor Williams could point to some evidence proving up *each* element of the penal statutes they alleged to have believed to have been violated. Instead, they rely upon conjecture and speculation, but then claim ignorance of the law. As trained law enforcement officers accusing a person of a crime, they are charged with identifying a penal statute and collecting evidence tending to establish each element under that penal statute. While they are not expected to understand all areas of the law, they are expected to be able to point to some credible evidence proving each element of an alleged violation of law. It is clear that Fulton did not misapply anything of value belonging to the government or rely on non-public information gained in her position as office manager at the WCSD to acquire or aid another to acquire a pecuniary benefit. Hart's and Williams' inability to point to evidence establishing even a prima facie violation of either penal statute compels the conclusion that their "belief," that Fulton's conduct violated former sections 39.01 or 39.03 is unreasonable in light of their training and experience. The evidence is legally and factually insufficient to support the jury finding that it was reasonable. Point one is sustained.

## EXPERT WITNESSES

The County contends in its second point that the trial court erred by excluding expert testimony from the Wichita County District Attorney that Hart and Williams lacked a reasonable basis for believing that a crime had occurred.

The County called Wichita County District Attorney Macha as an expert witness to testify concerning the reasonableness of Hart's and Williams' belief, in light of their training and experience, that former sections 39.01 and 39.03 of the penal code had been violated. Besides serving as the District Attorney, Macha teaches classes at law enforcement schools, including classes on criminal investigation techniques. He also has day-to-day exposure to deputies while he supervises law enforcement personnel in collecting evidence to determine whether a crime has been committed.

Macha testified during the County's bill of exceptions that he had reviewed all the documents in the case, Hart's and Williams' testimony, their training and experience, the legal definition of good faith as defined in *Hart* and former penal statutes 39.01 and 39.03.

[Hart]: No.
[The County]: In other words, you have got to have proof on each one of these elements, don't you?
[Hart]: Yes.
[The County]: All right. Now, not only do you have to understand the elements of the criminal or penal statute, but you have also got to have proof on each one of those elements, don't you?
[Hart]: You have to have proof on the elements.
[The County]: Sure.
[Hart]: I don't know if it's on all of them.
[The County]: Well, can you hope to make a case if you can't produce the owner of the property to say that it was without his knowledge and consent? Mr. Hart, don't now [sic] you have to prove each and every element of a penal statute in order to get a conviction or to have a case, don't you?
[Hart]: You have to prove the elements, yes, sir.
[The County]: And if any one of them are missing, then you don't have a case? I'm talking about theft here.

[Hart]: That's true.
[The County]: But what we say about theft, that could be said about any penal statute. You have got to prove the elements of the offense, correct?
[Hart]: Correct.
[The County]: All right. So therefore you have the statute on the one hand and your proof on the other?
. . . .
    You have got to have the elements and on the one hand you have got to understand and know what they are and then you have got to have proof that establishes each of those elements? Now that your case, isn't it?
[Hart]: Correct.
[The County]: And if you're a good police officer, when you go to the D.A.'s office of [sic] a theft case, you say, here is the offense and here is my investigation establishing the elements of this offense? You give him the case, isn't that correct?
[Hart]: Correct.

If he had been allowed to testify before the jury, Macha would have testified that in his opinion Hart and Williams did not report the alleged violations in good faith.

We review a trial court's exclusion of evidence for an abuse of discretion *See Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Under an abuse of discretion standard, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion. *See Beaumont Bank v. Buller,* 806 S.W.2d 223, 226 (Tex. 1991); *Texas Dep't of Health v. Buckner,* 950 S.W.2d 216, 218 (Tex.App.—Fort Worth 1997, no writ). However, merely because a trial court may decide a matter within its discretion in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion occurred. *See Downer,* 701 S.W.2d at 241–42.

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *See Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978); *see also Goode,* 943 S.W.2d at 446. Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *See Holley v. Holley,* 864 S.W.2d 703, 706 (Tex.App.—Houston [1st Dist.] 1993 writ denied).

The trial court excluded Macha's testimony without stating any reasons. Hart and Williams argue that the exclusion was proper because Macha's testimony was not on a controlling issue and was cumulative of Cross's testimony. We disagree.

Expert testimony is proper where it will aid the jury in understanding the evidence or determining a fact in issue. *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 365 (Tex.1987); *Hager v. Romines,* 913 S.W.2d 733, 735 (Tex.App.—Fort Worth 1995, no writ). Here, Hart's and William's good faith is a controlling issue in the case, and Macha's testimony would have assisted the jury in their fact finding function. Moreover, Macha's testimony is not cumulative. Cross, who was called by Hart and Williams, testified that he believed that Hart and Williams *had acted in good faith.* We conclude that the trial court abused its discretion by excluding Macha's testimony.

Having already found that the evidence was factually insufficient to support the jury's finding that Hart and Williams acted in good faith, we also find that the exclusion of Macha's testimony probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1). Macha's testimony went to a central issue in this case, was not cumulative, and probably would have made a difference in the jury's mind. Point two is sustained.

### CONCLUSION

We hold that the evidence is legally and factually insufficient. Hart and Williams were not able to point to some evidence establishing the elements of former sections 39.01 or 39.03. In light of their training and experience as law enforcement officers, their conjecture and "beliefs" that a violation of the law had occurred were unreasonable; and therefore, their report was not made in good faith. We also hold that District Attorney Macha's expert testimony should have been admitted. We reverse the trial court's judgment and render judgment that Appellees Hart and Williams recover nothing against the County in this cause. *See* TEX. R.APP. P. 43.3.