Town of Flower Mound v. Teague




COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-00-193-CV
 
TOWN OF FLOWER MOUND, TEXAS   
                                    
APPELLANT
V.
TOM TEAGUE AND DAVID BURKETT   
                                    
APPELLEES
------------
FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
------------
OPINION ON REHEARING
------------
I. Introduction
We withdraw our opinion and judgment of April 17, 2003 and substitute the
following. We deny the Town of Flower Mound's motion for rehearing.
In this whistleblower case, the Town of Flower Mound, Texas appeals from a
jury verdict for two former police officers, Tom Teague and David Burkett. In
twelve issues, the Town challenges the legal and factual sufficiency of the
evidence to support the trial court's judgment, contends there are errors in the
jury charge and the judgment, complains that the trial court improperly denied
the Town's post-judgment motions, complains that several of the trial court's
evidentiary rulings were erroneous, and contends that it is entitled to a new
trial due to inaccuracies in the reporter's record. We will affirm in part and
reverse and remand in part.
II. Background Facts and Procedural History
In 1995, Teague and Burkett were police officers for the Town. They were
assigned to the criminal investigation division (C.I.D.) of the Town's police
department. On November 28, 1995, Town patrol officers attempted to serve a
witness subpoena on Mary Womack in connection with a criminal case. The
defendant in that case had moved to suppress the evidence that Wess Jones, a
patrol officer, had obtained with a search warrant, and assistant district
attorney Brian Slabotsky planned to call Mary as a witness at the suppression
hearing.
Mary lived with her father-in-law, Ernest Womack, Sr. When the officers went
to Ernest's home to serve the subpoena, Ernest informed them that Mary was not
there, but had left several days earlier with a car that he had purchased for
Mary but that actually belonged to him. Ernest said that he had told Mary not to
leave or take the car and that he wished to file theft charges against her.
Officer Bentley took down the information and prepared a police report for
unauthorized use of a motor vehicle (UUMV). See Tex. Penal Code Ann. §
31.07 (Vernon 2003).
Through their prior dealings with the Womacks, most of the patrol officers
knew that Mary and Ernest had been living together as husband and wife and that
the missing car was "basically" Mary's, even though it was registered
to Ernest. The officers were familiar with what the car looked like and had seen
Mary driving it around town for a couple of years. In this type of situation,
the police department typically did not file criminal charges. Consequently,
while Bentley was completing the police report, Sergeant Greg Jones of the
patrol division instructed him to entitle the report as a missing persons report
rather than as a UUMV report. Bentley complied with this order. As titled, the
report alleged a nonprosecutable incident (missing person) rather than a
prosecutable offense (UUMV). Apart from the title, however, the report alleged
all the elements of UUMV.
At that time, Burkett was responsible for reviewing cases and warrants issued
within C.I.D. On the morning of November 29, Burkett reviewed the missing
persons report on Mary and assigned it to Investigator Ron McFadden. Burkett
noted, however, that the report contained all of the elements of UUMV. During
the departmental briefing on the same morning, Burkett informed the
investigators that he would contact Greg Jones to find out more about the case
and that, if it should prove to be a UUMV, the case would be reassigned as a
property offense. Greg Jones was in court that day, however, so Burkett was
unable to contact him immediately.
Also on November 29, Wess Jones learned of the report, and that Mary could
not be found, during a meeting with Slabotsky. Wess left that meeting with the
understanding that he needed to determine why the report had not been filed as a
UUMV and why, as a result, there was no warrant for Mary's arrest.
Wess Jones went to Burkett's office and asked why the case was not being
handled as a UUMV. There is conflicting evidence concerning the details of their
conversation. Burkett stated that he told Wess Jones he was sure Greg Jones had
reasons for not making the report a UUMV and instructed Wess not to take any
other action in the case until Burkett had talked with Greg. Burkett did not
indicate any knowledge of Wess's conversation with Slabotsky. Wess Jones
testified that Burkett said he also believed it should have been a UUMV, but
that patrol, not C.I.D., had decided how the report should be titled. Wess
further testified that he relayed to Burkett the conversation with Slabotsky and
asked if it would be a problem to change the report to UUMV. According to Wess
Jones, Burkett replied that, unless the investigator working on the case knew
something that Burkett did not, Burkett did not see why the report should not be
a UUMV. Burkett also told Jones where the report was and who the investigator
was.
Wess Jones then contacted Bentley and asked if Bentley would object to the
title of the report being changed from missing persons to UUMV. Bentley
responded that he believed only C.I.D. could authorize the change, but that it
was fine to change the report if C.I.D. gave the approval.
Wess Jones also contacted Teague, who was head of C.I.D. and its internal
affairs investigator. Wess asked Teague why the report had not been filed as a
theft or UUMV. Like the testimony about the Wess-Burkett conversation, the
testimony about this conversation is contradictory. Teague stated that he
explained to Wess that this type of situation did not qualify as a theft and
that he instructed Wess not to list the car as stolen, but to leave the report
as a missing persons report. Teague's opinions were apparently based on the
Denton County District Attorney's office's long-standing guidelines that
excluded the prosecution of this type of situation as a theft or UUMV. Like
Burkett, Teague did not indicate any knowledge of Wess's conversation with
Slabotsky.
Conversely, Wess Jones testified that, after gathering information from the
investigator and Bentley, he determined that it would probably be okay to change
the report. Burkett was not in his office, so Wess spoke with Teague and
"explained the whole situation to him." According to Wess, Teague told
Wess that Wess needed to prepare a probable cause affidavit, obtain a warrant,
and have the warrant information entered into the county's computer so that Mary
would be served with it if she was stopped by an officer.
Wess Jones then obtained permission from his supervisor, Sergeant Mike Pascoe,
to change the report title from missing persons to UUMV. Pascoe also helped Wess
prepare the probable cause affidavit and obtain a warrant for Mary's arrest for
UUMV.
On December 5, Burkett learned that a warrant had been issued for Mary's
arrest. This development raised questions in Burkett's mind. After checking with
Greg Jones and the records department, he discovered that a judge had issued the
warrant because Wess Jones had changed the title on the offense report and
attached the altered report to a probable cause affidavit. Burkett was concerned
that Wess Jones had committed a felony by arranging for Mary to be arrested
under false pretenses. Consequently, on December 6, he and Greg Jones notified
Teague about the situation.
After discussing the matter with Burkett and Greg Jones and reviewing their
paperwork, Teague also concluded that Wess Jones may have violated the law by
changing Bentley's report from a missing persons report to a felony offense
report in order to arrest Mary for a felony offense, simply as a pretext for
getting her into court as a witness. Like Burkett, Teague believed this was a
felony offense; therefore, he decided to contact the Denton County District
Attorney's office for advice on how to proceed. Teague was not certain whether
the proper procedure would be to just conduct an internal affairs investigation,
or whether a criminal investigation was also necessary. The three officers met
with assistant district attorney Kevin Henry, the district attorney's chief
intake officer. Henry confirmed that Wess Jones's behavior was consistent with
both misdemeanor and felony violations. (1) Henry
recommended that the case be prepared for grand jury review and that the
department also proceed with a parallel internal affairs investigation. Teague
reported these events and Henry's recommendation in a December 7 memo to Chief
David Brungardt. Teague also recommended to Chief Brungardt that Wess Jones
immediately be placed on administrative leave with pay, pending the outcome of
the investigations. With Chief Brungardt's authorization, Wess Jones was placed
on administrative leave on December 8, 1995.
Wess Jones was also notified of the investigations and the possible criminal
charges against him. Teague put himself in charge of the internal affairs
investigation and assigned Burkett the criminal one. During this time, Teague
and Chief Brungardt officed directly across from each other and attended the
same departmental staff meetings almost every morning. Chief Brungardt
"pretty much signed off" on the steps Teague took in the
investigations and did not voice any objections.
On December 19, 1995, Teague telephoned Town Attorney Terrance S. Welch and
asked whether the Town would accept Wess Jones's resignation if it turned out
that Jones had committed criminal violations. (2)
After talking with Teague, Welch became concerned that the two parallel
investigations were not being conducted separately and that Chief Brungardt may
not have been informed of the full extent of the investigations. Welch called
Henry, the Town's human resources director, and the previous acting police
chief, and he left a message for Chief Brungardt, who was out of the office. On
December 20, Welch met with the human resources director and the previous acting
police chief and recommended that the Town hire the firm of Parker-Jones, Inc.
to conduct an independent investigation of the Wess Jones matter. The three then
made this recommendation to the mayor, who agreed with it. At the end of the
meeting with the mayor, Chief Brungardt arrived. Chief Brungardt seemed a little
concerned about an outside investigation firm being hired, but he did not
disagree with the decision to hire Parker-Jones.
On the afternoon and evening of December 20, Chief Brungardt ordered both
Teague and Burkett to stop all investigations into the Wess Jones incident.
Parker-Jones investigated the matter. In early January 1996, Parker-Jones
reported to Welch verbally its determination that Wess Jones had not committed
any crime and that Teague's and Burkett's investigations may have been
malicious. Welch reported Parker-Jones's findings to Chief Brungardt, and, as a
result, Wess Jones was taken off of administrative leave. Parker-Jones then gave
the Town a written report of its findings and conclusions on February 9, 1996.
On January 15, 1996, Teague asked to be demoted from his position as
lieutenant of C.I.D. and to be transferred to patrol sergeant. Also on January
15, Burkett was transferred out of C.I.D. to the deep night patrol shift, and
Sergeant Ronald Nottingham was transferred from patrol to Teague's former
position in C.I.D. Wess Jones was returned to regular duty on January 16.
After assuming his new position, Nottingham approached Chief Brungardt and
expressed his concern about the enormous backlog of cases in C.I.D. Chief
Brungardt discussed this backlog with Welch and Ron Ragland, the Town manager.
Welch and Ragland decided to retain Parker-Jones again, this time to investigate
C.I.D. primarily, but also to conduct further investigation into the Wess Jones
matter. Chief Brungardt went along with this decision.
Meanwhile, Teague contacted Henry to find out whether the documentation on
the Wess Jones matter had been presented to the district attorney's office. Upon
learning that it had not, Teague and Burkett attempted to file a grievance with
Ragland, the Town manager. They were told, however, that they had to file their
complaint with Chief Brungardt first, or their failure to do so would be
considered insubordination. They also requested a meeting with Chief Brungardt
to discuss the matter, but Chief Brungardt refused to meet with them. On January
25, appellees filed a written grievance with Chief Brungardt, in which they
stated their concerns that: Chief Brungardt and Wess Jones had developed a close
personal and working relationship; either Wess had lied about his actions
related to the Mary Womack report and arrest warrant or the individuals whose
accounts of the incidents conflicted with Wess's account had lied; Chief
Brungardt had chosen not to submit appellees' documented evidence concerning the
Wess Jones incident to the district attorney's office, but had instead, contrary
to departmental procedure, substituted only verbal interpretations that were
consistent with his own purposes; and Chief Brungardt had elected to cover up
either Wess Jones's or his accusers' allegations.
Two days later, Teague and Burkett requested a meeting with Ragland. Although
Chief Brungardt approved the request on January 30, the meeting was later
cancelled. Instead, Chief Brungardt placed Teague and Burkett on administrative
leave with pay on January 31, pending an investigation into their alleged
dereliction of duty, including the backlog of cases in C.I.D. and their
investigation of the Wess Jones matter.
On February 5, 1996, Chief Brungardt denied appellees' grievance, and they
appealed that determination to Ragland. The record does not contain any ruling
from Ragland.
After conducting its second investigation, Parker-Jones determined that
Teague and Burkett had been derelict in their duties by leaving so many cases in
C.I.D. open during their tenure there. Parker-Jones also concluded that Wess
Jones "was maliciously subjected to an internal investigation." On May
23, 1996, Chief Brungardt presented Teague and Burkett with copies of the second
Parker-Jones report, which numbered 1200-1500 pages in length, and asked them to
respond to the report. In early June 1996, Teague and Burkett were discharged,
allegedly based on the findings in the Parker-Jones report.
Teague and Burkett then filed the underlying whistleblower action. The jury
returned a verdict in their favor, the trial court rendered judgment on the
verdict, and this appeal followed.
III. Sufficiency of Evidence
In its first, second, third, sixth, seventh, and eighth issues, the Town
contends the evidence is legally and factually insufficient to establish that
appellees made a good faith report of a violation of law to an appropriate law
enforcement authority. The Town further contends that the evidence is legally
and factually insufficient to establish a causal link between appellees' report
and their termination. Finally, the Town asserts that the evidence shows
appellees' discharge would have occurred even if they had not made a report that
is protected by the Act.
A. Standards of Review
In determining a "no-evidence" issue, we are to consider only the
evidence and inferences that tend to support the finding and disregard all
evidence and inferences to the contrary. Bradford v. Vento, 48 S.W.3d
749, 754 (Tex. 2001); Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d
444, 450 (Tex. 1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d
660, 661 (1951). Anything more than a scintilla of evidence is legally
sufficient to support the finding. Cazarez, 937 S.W.2d at 450;
Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996). There is some evidence
when the proof supplies a reasonable basis on which reasonable minds may reach
different conclusions about the existence of the vital fact. Orozco v.
Sander, 824 S.W.2d 555, 556 (Tex. 1992).
An assertion that the evidence is "insufficient" to support a fact
finding means that the evidence supporting the finding is so weak or the
evidence to the contrary is so overwhelming that the answer should be set aside
and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965). We are required to consider all of the evidence in the case in making
this determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402,
406-07 (Tex.), cert. denied,525 U.S. 1017 (1998).
B. Good Faith Report
The Act prohibits a state or local governmental entity from terminating the
employment of a public employee who in good faith reports a violation of law by
another public employee to an appropriate law enforcement authority. Tex. Gov't
Code Ann. § 554.002(a) (Vernon Supp. 2003). The Act is remedial in nature and
must be liberally construed. Castaneda v. Tex. Dep't of Agric.,831
S.W.2d 501, 503 (Tex. App.--Corpus Christi 1992, writ denied). Its purposes are
(1) to enhance openness in government by protecting public employees who inform
proper authorities of legal violations and (2) to secure governmental compliance
with the law on the part of those who direct and conduct governmental affairs. Upton
County v. Brown, 960 S.W.2d 808, 817 (Tex. App.--El Paso 1997, no pet.); Tarrant
County v. Bivins, 936 S.W.2d 419, 421 (Tex. App.--Fort Worth 1996, no
writ).
The Texas Supreme Court has defined good faith to mean that (1) the employee
believed that the conduct reported was a violation of law and (2) the employee's
belief was reasonable in light of the employee's training and experience. Wichita
County v. Hart, 917 S.W.2d 779, 784 (Tex. 1996) (Wichita I). The
first prong of this test takes into consideration the employee's subjective
belief: whether the employee honestly believed the conduct reported was a
violation of law. Id. at 784-85. The second prong is objective because
it measures the employee's belief against that of a reasonably prudent employee
in similar circumstances. Id. at 785. Because of his training and
experience in assessing legal violations, the reasonableness of a peace
officer's belief that a law has been violated will be examined more closely than
will the belief of a person who is not in law enforcement. Harris County
Pct. Four Constable Dep't v. Grabowski, 922 S.W.2d 954, 956 (Tex. 1996); Wichita
County v. Hart, 989 S.W.2d 2, 6 (Tex. App.--Fort Worth 1999, pet. denied) (Wichita
II). A report of an alleged violation of law may be in good faith even
though incorrect, however, as long as a reasonable person with the employee's
same level of training and experience would also have believed that a violation
had occurred. Tex. Dep't of Transp. v. Needham, 82 S.W.3d 314, 320
(Tex. 2002); Wichita I, 917 S.W.2d at 785-86.
In this case, the evidence shows that both Burkett and Teague honestly
believed that Wess Jones had violated the law if he had changed Bentley's report
so that Mary would be arrested simply as a pretext for getting her into court as
a witness. Also, Teague's memorandum placing Wess on administrative leave lists
the elements of four criminal offenses: perjury, tampering with or fabricating
physical evidence, tampering with a government record, and official oppression.
This evidence is legally and factually sufficient to satisfy the first prong of
the good faith test.
There is also evidence that a reasonably prudent law enforcement officer in
similar circumstances would have believed a violation of law had occurred. The
record shows that Kevin Henry in the district attorney's office believed that
Wess's conduct was consistent with certain crimes. In addition, Chief
Brungardt's authorization of the placement of Wess Jones on administrative leave
is evidence that Chief Brungardt also believed one or more violations of law had
occurred. This evidence is legally and factually sufficient to satisfy the
second prong of the good faith test. (3)
The Town contends that appellees' belief that a violation of law had occurred
was not in good faith because Parker-Jones concluded as a result of its
investigation that Wess Jones had committed no crime. The Town further contends
that, if no violation of law occurred, appellees could not have reported it in
good faith.
Whether a violation of law has occurred is a question of law for the court to
decide. Rogers v. City of Fort Worth, 89 S.W.3d 265, 274 (Tex.
App.--Fort Worth 2002, no pet.); see also Comm. on Pattern Jury
Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 107.4 cmt. (2000)
(stating that whether report concerned a violation of "law" and
whether person or entity receiving report is "appropriate law enforcement
authority" are questions of law). But see Tex. Dep't of Crim. Justice
v. Terrell, 925 S.W.2d 44, 59 (Tex. App.--Tyler 1995, no writ) (addressing
"law" as an issue of fact). Thus, Parker-Jones's conclusion is not
dispositive of whether Wess Jones violated a law. In addition, appellees' good
faith belief is judged based on the information they had before them when they
made their report to the district attorney and Chief Brungardt, not on the
potentially exonerating evidence that Parker-Jones may have later discovered. See
Wichita I, 917 S.W.2d at 785 (focusing on whether reasonably prudent
employee in similar circumstances would have believed that the facts as
reported were a violation of law).
Further, even if appellees were incorrect in their belief that Wess Jones had
violated a law, their report was still made in good faith if a reasonable person
with appellees' same level of training and experience would also have believed
that a violation of law had occurred. See id. at 785-86; see also
Needham, 82 S.W.3d at 320 (holding that employee who reports violation of
law to an agency that is not an appropriate law enforcement authority may
nonetheless be entitled to whistleblower protection if he, in good faith,
believed agency was the appropriate authority). The evidence here supports the
jury's finding of such a good faith belief with regard to Wess Jones.
(4)
The Town asserts, however, that there is no evidence to support the jury's
finding that appellees had a good faith belief that Chief Brungardt's alleged
cover-up was a violation of law and, consequently, the judgment should be
reversed even if the evidence supports the jury's finding as to Wess Jones.
Neither Teague nor Burkett have contended that they believed in good faith that
Chief Brungardt had violated a law, and they did not report Chief Brungardt's
alleged cover-up to the district attorney's office. Instead, they simply filed
an employee grievance with the Town, alleging violations of two police
department administrative orders. This is not evidence that appellees believed
Chief Brungardt had violated the law. (5)
However, the lack of sufficient evidence to support a finding that appellees
believed in good faith that Chief Brungardt's alleged cover-up was a violation
of law does not support reversal of the judgment in this case. Appellees' good
faith report of an alleged violation of law by either Wess Jones or Chief
Brungardt was sufficient to establish the good faith element of their
whistleblower claim. See Tex. Gov't Code Ann. § 554.002(a) (providing
that governmental entity may not terminate the employment of a public employee
who in good faith reports a violation of law). (6)Because
there is sufficient evidence to support the jury's finding that appellees in
good faith reported a violation of law by Wess Jones, the judgment must be
upheld. (7)
C. Appropriate Law Enforcement Authority
The Town also contends that the evidence is legally insufficient to support a
finding that appellees made their report to an "appropriate law enforcement
authority," because appellees simply reported Chief Brungardt's alleged
cover-up of the Wess Jones incident to Ragland, the Town manager, who was not an
appropriate law enforcement authority. (8)
The Town does not, however, dispute that the district attorney and Chief
Brungardt were appropriate law enforcement authorities under the Act's
definition or that appellees reported Wess Jones's alleged violations of law to
these authorities. (9) Thus, for the reasons
stated above, appellees' report of Wess Jones's alleged violations of law to the
district attorney and Chief Brungardt was sufficient to establish this element
of their whistleblower claim. See Tex. Gov't Code Ann. § 554.002(a).
(10)
D. Causation
The Town asserts that the evidence is legally and factually insufficient to
establish that appellees were discharged because they made good faith
allegations against Wess Jones and because they complained to Chief Brungardt
about his alleged cover-up of the Wess Jones matter. Instead, the Town contends
that appellees were discharged because of poor job performance, dereliction of
duty, and, in Burkett's case, insubordination for refusing to take a polygraph
examination.
To prove causation in a whistleblower case, an employee need not prove that
his reporting of the illegal conduct was the sole reason for the employer's
adverse action. Tex. Dep't of Human Servs. v. Hinds, 904 S.W.2d 629,
634 (Tex. 1995); City of Fort Worth v. Zimlich, 975 S.W.2d 399, 406
(Tex. App.--Austin 1998) (Zimlich I), rev'd in part on other
grounds, 29 S.W.3d 62 (2000). Rather, to show causation, a public employee
must demonstrate that after he reported a violation of law, in good faith, to an
appropriate law enforcement authority, the employee suffered discriminatory
conduct by his employer that would not have occurred when it did had the report
not been made. City of Fort Worth v. Zimlich, 29 S.W.3d 62, 67 (Tex.
2000) (Zimlich II); Hinds, 904 S.W.2d at 637. This causation
standard has been described as a "but for" causal nexus requirement. Tex.
Natural Resource Conservation Comm'n v. McDill, 914 S.W.2d 718, 723 (Tex.
App.--Austin 1996, no writ).
Circumstantial evidence may be sufficient to establish a causal link between
the adverse employment action and the reporting of the illegal conduct. Zimlich
II, 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of
illegal conduct; (2) expression of a negative attitude toward the employee's
report of the conduct; (3) failure to adhere to established company policies
regarding employment decisions; (4) discriminatory treatment in comparison to
similarly situated employees; and (5) evidence that the stated reason for the
adverse employment action was false. Id.; Cazaraz, 937 S.W.2d at 451.
But evidence that an adverse employment action was preceded by a superior's
negative attitude towards an employee's report of illegal conduct is not enough,
standing alone, to show a causal connection between the two events. There must
be more. Zimlich II, 29 S.W.3d at 69.
Here, it is undisputed that both people involved in the decision to terminate
appellees' employment--Chief Brungardt and Welch--knew of appellees' reports
regarding Wess Jones. Chief Brungardt also knew of appellees' complaint about
his alleged cover-up of the Wess Jones matter. Welch expressed a negative
attitude toward appellees' report of Jones's conduct. Welch testified that,
almost immediately after learning of the report and the investigation, he sought
to remove appellees from the investigation and hire Parker-Jones. Welch
testified that he hired Parker-Jones because of his concern about the way Teague
was handling the internal investigation and his apparently mistaken belief that
Chief Brungardt was unaware of appellees' investigation and the possible charges
against Wess Jones. Part of Welch's motivation, however, was his concern that
the filing of criminal charges against Wess Jones would be "a big issue in
the press." In addition, he made the decision to hire Parker-Jones without
even consulting Chief Brungardt until after the mayor had already approved the
decision.
Chief Brungardt initially did not express a negative attitude towards
appellees' report of Wess Jones's conduct. Later, however, he became
"visibly angered" when Teague expressed his intent to involve a Texas
Ranger, at assistant district attorney Henry's suggestion, in conducting a
completely independent criminal investigation. Chief Brungardt also ordered
appellees to stop investigating the Wess Jones matter after authorizing them to
conduct the investigation in the first place. In addition, appellees were placed
on administrative leave so they could be investigated for alleged falsification
of Town records and dereliction of duty--just three-and-a-half months after
Chief Brungardt had approved an outstanding performance evaluation for Burkett
and one month after Chief Brungardt had personally given Teague an outstanding
performance evaluation.
There is also evidence that the Town did not adhere to its established
policies regarding employment decisions. For instance, when Chief Brungardt
ordered Teague to stop investigating Wess Jones, he did so by phone call to
Teague's home at 10 o'clock at night, something Teague had never experienced in
his nineteen-and-a-half years in law enforcement. As a result, Teague believed
"something was very much out of place." In addition, Welch was present
at the meeting during which Chief Brungardt placed Burkett on administrative
leave, which Burkett testified was unusual. Further, according to departmental
procedure, all cases sent to the district attorney's office for prosecution were
submitted in writing with all available documentation attached. But Chief
Brungardt did not submit appellees' documented evidence concerning the Wess
Jones incident to the district attorney's office; instead, the case was only
verbally "run by" the district attorney.
Additionally, there is some evidence that appellees were treated worse than
similarly situated employees. Teague was the lieutenant in charge of C.I.D. from
October 1995 through January 1996. From December 1994 through October 1995,
however, Byron Lake was the lieutenant in charge of C.I.D. He was in charge of
C.I.D. for longer than either of appellees, and in 1995 he had been the subject
of a no-confidence vote by the Town's police association.
(11) Lake was not put on administrative leave because of the backlog
of cases in C.I.D., however, and he was questioned by Parker-Jones for less than
one day. In contrast, Burkett was questioned for seven days straight, eight or
nine hours a day, plus an additional day later on. Teague was also questioned
for six or seven days. Lake did not report Wess Jones's conduct to the district
attorney, nor did he join in appellees' January 25, 1996 grievance against Chief
Brungardt for allegedly covering up the Wess Jones investigation. Appellees were
discharged, and Lake was eventually promoted to captain.
The Town asserts that appellees were treated the same as three other
similarly situated employees--Greg Jones and Investigators Mary Estrello and Ron
McFadden--because all three of these employees were also discharged as a result
of Parker-Jones's investigation. These individuals were not all similarly
situated to appellees. Only Estrello and McFadden worked in C.I.D. Greg Jones
did not; he was a patrol sergeant. In addition, Greg Jones had joined appellees
in reporting Wess Jones's alleged criminal conduct to the district attorney's
office.
Estrello's and McFadden's discharge is evidence that appellees were not
treated worse than some other similarly situated employees. When viewed in the
light of the evidence of causation as a whole, however, this evidence is not so
overwhelming that the jury's finding should be set aside and a new trial
ordered. Garza, 395 S.W.2d at 823.
Finally, Welch testified that appellees were discharged for "gross
dereliction of duty" and because they were not providing services to the
Town's citizens. Welch further testified that Burkett was discharged for
insubordination because he failed to take a polygraph examination. The
Parker-Jones report is some evidence to support the first two of Welch's stated
reasons. Much of the evidence we have previously discussed, however, is evidence
that these stated reasons were false. In addition, Burkett testified that he did
not refuse to take a polygraph examination. Initially, the Town wanted
Parker-Jones to give Burkett the polygraph examination. Burkett was apparently
uncomfortable with this proposed arrangement because he believed Parker-Jones
was participating in the cover-up of the Wess Jones investigation. Through his
attorney, however, Burkett offered to work with the Town to find a neutral
operator to administer the examination. Welch was involved in the conversations
with Burkett's attorney to try to find a neutral examiner.
Also, though the Parker-Jones report criticized appellees because cases in
C.I.D. were not being properly investigated, Burkett denied approving the
closing of any cases when there were leads to follow. In addition, it was Chief
Brungardt who had instructed the investigators in August 1995, before Teague was
in charge of C.I.D., to follow up on whatever leads they had in their open files
and then inactivate them. Georgia Hernandez, a former C.I.D. officer, confirmed
this and also testified that nothing changed in the way the C.I.D. investigators
worked after Nottingham replaced Teague.
Further, Chief Brungardt had let it be known early on in his administration
that he considered Wess Jones to be the key to the Town's police association.
Wess Jones was the association's spokesman, and Chief Brungardt informed Teague
that he (Brungardt) intended to use Jones to "deliver the police
association" to Chief Brungardt or to his way of thinking. Wess Jones was
in Chief Brungardt's office on many occasions and participated in many
closed-door meetings with him, even though Wess was only a patrol officer.
Teague testified that it was unusual for a patrol officer like Wess to spend so
much time in the chief's office. Teague likened Wess Jones's and Chief
Brungardt's relationship to that between a private and a general.
The Town asserts that its hiring of Parker-Jones broke the chain of causation
because Parker-Jones conducted an outside, independent investigation of
appellees' conduct. See Long v. Eastfield College, 88 F.3d 300, 307 (5th
Cir. 1996); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th
Cir. 1990) (both indicating that, in Title VII cases, causal link between
alleged retaliatory intent and termination may be broken if uninvolved third
party makes actual decision to terminate after conducting its own independent
investigation). We are not persuaded by this argument. Parker-Jones's
investigation of appellees was not completely independent of the Town because
Welch, the Town's attorney, participated in the Parker-Jones interviews. In
addition, Parker-Jones did not make the decision to discharge appellees; Welch
and Chief Brungardt did.
We hold that the evidence is legally and factually sufficient to establish
that the Town would not have terminated appellees' employment when it did if
appellees had not reported the Wess Jones matter to the district attorney and
Chief Brungardt. See Zimlich II, 29 S.W.3d at 68; McDill, 914
S.W.2d at 723. Although there is conflicting evidence as to why appellees were
discharged, the jury was free to believe some witnesses, disbelieve others, and
to resolve any inconsistencies in their testimony. McGalliard, 722
S.W.2d at 697. The evidence supporting the jury's finding on causation is not so
weak or the evidence to the contrary so overwhelming that the answer should be
set aside and a new trial ordered. Garza, 395 S.W.2d at 823.
Accordingly, there is sufficient evidence of causation to support the jury's
verdict.
Based on the foregoing discussion, we overrule the Town's first, second,
third, sixth, seventh, and eighth issues.
IV. Jury Charge
In its fourth and fifth issues, the Town complains that the trial court
reversibly erred by overruling the Town's objections to the jury instructions
and questions and by refusing to submit the Town's proposed instructions and
questions.
A. Standard of Review
The standard of review for alleged jury charge error is abuse of discretion. Tex.
Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (op. on
reh'g); Steak & Ale v. Borneman, 62 S.W.3d 898, 904 (Tex.
App.--Fort Worth 2001, no pet.). Abuse of discretion occurs only when the trial
court acts arbitrarily, unreasonably, or without reference to any guiding
principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
241-42 (Tex. 1985),cert. denied, 476 U.S. 1159 (1986); Borneman,
62 S.W.3d at 904.
The rules of civil procedure require the trial court to "submit such
instructions and definitions as shall be proper to enable the jury to render a
verdict." Tex. R. Civ. P. 277. A proper jury instruction is one that
assists the jury and is legally correct. Oechsner v. Ameritrust Tex., N.A.,
840 S.W.2d 131, 133-34 (Tex. App.--El Paso 1992, writ denied). An instruction
that misstates the law or misleads the jury does not meet this standard. White
v. Liberty Eylau ISD, 920 S.W.2d 809, 812 (Tex. App.--Texarkana 1996, writ
denied). In addition, the trial court may refuse a requested instruction, even
if it properly states the law, if it is not necessary to enable the jury to
render a verdict. Id. at 811-12.
B. Instruction on Causation
The Town requested the following instruction on causation:

 Plaintiffs Tom Teague and David Burkett each must demonstrate that there
 existed a "but for" causal link between making the report and their
 termination. In other words, Plaintiffs Tom Teague and David Burkett must each
 prove that without the report of violation of law (assuming that each made
 such a report), their termination would not have occurred when it did. An
 employer does not discriminate against an employee for reporting a violation
 of law, in good faith, to an appropriate law enforcement authority, unless the
 employer's action would not have occurred when it did had the report not been
 made. You are further instructed that if the Town had sufficient grounds
 for terminating Plaintiff Tom Teague and Plaintiff David Burkett, it cannot be
 liable for such termination simply because of Teague and Burkett's report of
 illegal conduct. [Emphasis supplied.]
 
 

The trial court's charge to the jury included this instruction except for the
italicized language.
The Town contends that the trial court erred by omitting the italicized
language from the charge. We disagree. The requested instruction is a
misstatement of the causation standard in whistleblower cases. The Whistleblower
Act does not require an employee to prove that his reporting of illegal conduct
was the sole reason for his employer's adverse actions. Hinds, 904
S.W.2d at 634. Instead, the standard of causation in whistleblower cases is that
the employee's protected conduct must be such that, without it, the employer's
prohibited conduct would not have occurred when it did. Id. at 636. The
instructions that the trial court included in the charge properly stated this
standard. (12) Thus, the trial court did not
abuse its discretion by omitting the Town's requested instruction from the
charge. E.B., 802 S.W.2d at 649;Borneman, 62 S.W.3d at 904.
The Town also complains that the trial court erred by not submitting the
defensive question: "Would the Town of Flower Mound have
terminated Plaintiff Tom Teague[/David Burkett] without consideration of
Plaintiff's 'whistleblowing' activity, if any such activity occurred?" This
is an inferential rebuttal defense. (13) Under
Rule 277, inferential rebuttal defenses "shall not be submitted in the
charge." Tex. R. Civ. P. 277. If properly raised by the evidence, however,
such defenses may be presented to the jury in an instruction, which is what the
trial court did in this case. (14) Id.; see
also La.-Pac. Corp. v. Knighten, 976 S.W.2d 674, 676 (Tex. 1998). Thus, the
trial court did not abuse its discretion in refusing to submit the Town's
defensive issue as a jury question.
C. Instruction on Appropriate Law Enforcement
Authority
The Town asserts that the trial court erred in refusing to include the Town's
requested instruction on what constitutes an appropriate law enforcement
authority. According to the Town, the trial court should have determined as a
matter of law that the Town manager was not an appropriate law enforcement
authority under the Act. For the reasons stated above,
(15) we hold that the trial court did not err by refusing to instruct
the jury on who is a proper law enforcement authority.
D. Instruction on Adverse Personnel Action
The Town contends that the trial court erred by not including the Town's
requested definition of "adverse personnel action" and that, as a
result, the jury was free to consider whether appellees' being placed on
administrative leave with pay was an adverse personnel action. The court's
charge defines "personnel action" as "an action that affects a
public employee's compensation, promotion, demotion, transfer, work assignment,
or performance evaluation." This definition is a direct quote of the
statutory definition. Tex. Gov't Code Ann. § 554.001(3).
When a statute defines a term, a court is bound to construe that term by its
statutory definition only. Needham, 82 S.W.3d at 318. The Town's
requested definition did not track the statutory language, so the trial court
did not err by refusing to include it. In addition, we believe the term
"adverse" is so common that no definition was required to enable the
jury to render a verdict. See Tex. R. Civ. P. 277.
The Town's real complaint seems to center around the trial court's refusal to
affirmatively instruct the jury that the placing of appellees on administrative
leave with pay was not an adverse personnel action. (16)
The only question that the jury was asked to decide, however, was whether the
Town's decision toterminate appellees' employment was the result of
appellees' reporting of alleged violations of law. Because the jury was not
asked to decide whether the placing of appellees on administrative leave was an
adverse personnel action, the trial court did not abuse its discretion by
refusing to include this instruction.
E. Instruction on Rebuttable Presumption
The trial court instructed the jury that:

 The Whistleblower Act specifies that there is a presumption that a report
 of a violation of law, if any, caused the retaliatory conduct about which
 Plaintiffs Tom Teague and David Burkett complain, if the retaliatory conduct
 occurred within ninety days of the report of the violation of law. That
 presumption is rebuttable by the Town of Flower Mound, if you find that the
 alleged retaliatory conduct was justified based upon the stated reasons given
 by the Town of Flower Mound for the action(s) taken.

The Town requested that the following sentence be added to the instruction:
"You are instructed that, since Plaintiffs Tom Teague and David Burkett
were each terminated from employment more than ninety days from their alleged
report of a violation of law, this presumption of causation is not available as
to Plaintiffs' unlawful termination claim." When the trial court refused to
add this sentence, the Town objected that the instruction did not
"adequately advise a jury of the law applicable to this case" and
would therefore cause the rendition of an improper verdict.
On appeal, the Town complains that the instruction as given constituted an
improper comment on the weight of the evidence and did not properly place the
burden of proof. The Town also complains that the instruction probably caused
the rendition of an improper verdict because it allowed the jury to presume that
the timing of appellees being placed on administrative leave with pay, rather
than their discharge, was sufficient retaliatory conduct "to establish this
element of their claim."
These complaints are waived because they were not raised below. SeeTex.
R. App. P. 33.1(a). In addition, as we have previously noted, the jury was not
asked to decide whether the Town retaliated against appellees by placing them on
administrative leave with pay; the jury was only asked whether the Town
retaliated against appellees by terminating their employment.
F. Town's Proposed Instructions
The Town contends that the trial court erred in failing to submit the
following liability issue: "Do you find from a preponderance of the
evidence that Tom Teague[/David Burkett] in good faith reported a violation of
law to an appropriate law enforcement authority which caused the Town of Flower
Mound to terminate his employment?" (17) If
submitted, this issue would have required the jury to answer the following
questions: (1) whether a public employee reported a violation of law; and (2)
whether the report was made to an appropriate law enforcement authority. The
questions of whether the report was about a violation of law or made to an
appropriate law enforcement authority are questions of law and should not be
submitted to a jury. See Needham, 82 S.W.3d at 318; Rogers, 89
S.W.3d at 274; Knutson v. Ripson, 346 S.W.2d 424, 426 (Tex. Civ.
App.--Amarillo 1961), aff'd, 163 Tex. 312, 354 S.W.2d 575 (1962); Jones
v. Winter, 215 S.W.2d 654, 656 (Tex. Civ. App.--Amarillo 1948, writ ref'd
n.r.e.). Therefore, the trial court did not abuse its discretion in refusing to
submit the requested issue.
G. Jury Questions on Damages and Attorney's Fees
In three sentences, the Town complains that the trial court erred by
submitting damages questions to the jury because there was insufficient evidence
to warrant submission of these questions. The Town does not explain why the
evidence was insufficient, nor does it cite any legal authority to support its
position. We are not required to search a voluminous record, with no guidance
from the Town, to discover possible trial court error. See Harkins v. Dever
Nursing Home, 999 S.W.2d 571, 573 (Tex. App.--Houston [14thDist.]
1999, no pet.); Hall v. Stephenson, 919 S.W.2d 454, 467 (Tex.
App.--Fort Worth 1996, writ denied). Accordingly, this complaint is waived, and
we will not address it. See Fredonia State Bank v. Gen. Am. Life Ins. Co.,881
S.W.2d 279, 284 (Tex. 1994) (citing long-standing rule that a point may be
waived due to inadequate briefing).
The Town also contends that appellees' question on attorney's fees should not
have been submitted because the evidence is legally and factually insufficient
to support appellees' whistleblower claims. As we have previously discussed,
however, the evidence is legally and factually sufficient.
(18) We overrule the Town's fourth and fifth issues.
V. Judgment
In its eleventh issue, the Town complains that the trial court's judgment
does not conform to the jury's verdict. See Tex. R. Civ. P. 301. The
Town attacks the recitation in the judgment that the jury found that the Town
terminated appellees' employment because appellees "reported violations of
law by Town of Flower Mound employees to an appropriate law enforcement
authority." The Town complains that the jury found that the Town's decision
to terminate appellees' employment was because of their good faith allegations
against Wess Jones and Chief Brungardt, but that the jury did not find appellees
reported a violation of law to an appropriate law enforcement authority.
We have held that the evidence sufficiently supports the verdict against the
Town on appellees' whistleblower claims. The judgment conforms to the verdict.
Accordingly, we overrule the Town's argument that the judgment does not conform
to the verdict.
The Town also complains of the recitation in the judgment that a jury was
duly empaneled "consisting of twelve good and lawful jurors." The Town
contends that it had an insufficient basis for knowing whether the jurors were
"good and lawful" and that the rules of civil procedure only require
jurors to be qualified. This argument is patently without merit and is,
therefore, overruled.
A. Prejudgment Interest
The Town also asserts that the trial court included the incorrect amount of
prejudgment interest in the judgment. Prejudgment interest is compensation
allowed by law as additional damages for lost use of the money due as damages
during the lapse of time between the accrual of the claim and the date of
judgment. Johnson & Higgins v. Kenneco Energy, Inc., 962 S.W.2d
507, 528 (Tex. 1998); Taylor Foundry Co. v. Wichita Falls Grain Co., 51
S.W.3d 766, 775 (Tex. App.--Fort Worth 2001, no pet.). The Supreme Court of
Texas has held that, under the common law, prejudgment interest begins to accrue
on the earlier of (1) 180 days after the date a defendant receives written
notice of a claim or (2) the date the suit is filed. Johnson & Higgins,
962 S.W.2d at 531.
In adopting this rule, the supreme court conformed the common law to the
legislative policy established in chapter 304 of the finance code. Id.
at 528 & n.9; see also Tex. Fin. Code Ann. §§ 304.101, .104
(Vernon Supp. 2003) (providing that, in wrongful death, personal injury, and
property damage cases, prejudgment interest accrues "beginning on the
earlier of the 180th day after the date the defendant receives
written notice of a claim or the date the suit is filedand ending on
the day preceding the date judgment is rendered") (emphasis supplied). The
supreme court's purpose was to restore uniformity to the law of prejudgment
interest. Johnson & Higgins, 962 S.W.2d at 533.
In this case, appellees first filed their whistleblower lawsuit in federal
district court on April 18, 1996. That suit was later dismissed, and appellees
refiled their whistleblower lawsuit in state court in February 1998. The Town
contends that the date the federal suit was filed does not control because
"the date the suit is filed" refers only to the suit in which
prejudgment interest is actually awarded. Conceding that it received notice of
appellees' claim "in March of '96," the Town contends that prejudgment
interest began accruing 180 days later, in September 1996. Conversely, appellees
contend, and the trial court ruled, that prejudgment interest began accruing on
April 18, 1996, when appellees filed their whistleblower lawsuit in federal
court. This is an issue of first impression. (19)
We look to the legislative intent behind section 304.104 for guidance in
determining what this phrase means. In interpreting a statute, we look to the
intent of the legislature as expressed in the language of the statute. Nat'l
Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000); Hodges
v. Thompson, 932 S.W.2d 717, 719 (Tex. App.--Fort Worth 1996, no writ). We
consider first the statute's plain and common meaning and presume that the
legislature intended the plain meaning of its words. Fleming Foods v.
Rylander,6 S.W.3d 278, 282, 284 (Tex. 1999); see also Tex. Gov't
Code Ann. § 312.002(a) (Vernon 1998) (providing that words in statutes shall be
given their ordinary meaning). Words and phrases are to be read in context and
construed according to the rules of grammar and common usage. Tex. Gov't Code
Ann. § 311.011(a). We must also presume that the legislature used every word of
a statute for a purpose, and we must give effect to every sentence, clause,
phrase, and word if reasonably possible. Cities of Austin, Dallas, Fort
Worth & Hereford v. S.W. Bell Tel. Co., 92 S.W.3d 434, 442 (Tex. 2002);Eddins-Walcher
Butane Co. v. Calvert, 156 Tex. 587, 298 S.W.2d 93, 96 (1957); Reames
v. Police Officers' Pension Bd., 928 S.W.2d 628, 632 (Tex. App.--Houston
[14th Dist.] 1996, no writ).
"The" is a function word used to indicate that a following noun or
noun equivalent is definite or has been previously specified by context or
circumstance, or is a unique or particular member of its class.
Merriam-Webster's Collegiate Dictionary 1221 (10th ed. 1994).
Applying the ordinary meaning of "the" and presuming that the
legislature used it immediately preceding "suit" for a purpose, we
conclude that the legislature intended "the date the suit is
filed" to refer to the filing of a particular lawsuit--the one in which
judgment is rendered--not the filing of a lawsuit in general. This construction
also makes sense when read in context with the rest of section 304.104, which
provides that "prejudgment interest accrues on the amount of a judgment
during the period beginning on . . . the date the suit is filed and ending on
the day preceding the date judgment is rendered." Tex. Fin. Code Ann. §
304.104.
We hold that the trial court erred by awarding appellees prejudgment interest
from the date they filed their federal whistleblower lawsuit because the federal
suit is not the suit in which the judgment in this case was rendered.
Consequently, the trial court should have awarded prejudgment interest from 180
days after the date the Town admittedly received written notice of appellees'
claim in March 1996. See Johnson & Higgins, 962 S.W.2d at 531;see
also Tex. Fin. Code Ann. § 304.104.(20)
B. Attorney's Fees
The Town's final argument in its eleventh issue is that the trial court
improperly calculated appellees' attorney's fees. The jury found that appellees'
reasonable attorney's fees were twenty-five percent of their
"recovery." The trial court's judgment awards appellees attorney's
fees in an amount equal to twenty-five percent of their damages awards and
prejudgment interest. The Town asserts that the jury would have understood the
term "recovery" as referring solely to the damages that the jury
awarded and that appellees were, therefore, only entitled to attorney's fees in
an amount equal to twenty-five percent of their damages awards. The Town cites
no legal authority to support its position.
The award of attorney's fees equal to twenty-five percent of appellees'
damages plus prejudgment interest is proper based on the type of jury question
submitted in this case. See St. Paul Surplus Lines Ins. Co. v. Dal-Worth
Tank Co., 917 S.W.2d 29, 63 (Tex. App.--Amarillo 1995) (affirming, based on
similar jury question, attorney's fee award that included prejudgment interest),aff'd
in pertinent part, 974 S.W.2d 51 (Tex. 1998); see also Johnson &
Higgins, 962 S.W.2d at 528-29 (stating that prejudgment interest is
compensation allowed by law as additional damages and is necessary to fully
compensate injured plaintiffs). Therefore, the trial court did not err in basing
the attorney's fees award on appellees' damages plus prejudgment interest.
We sustain the portion of the Town's eleventh issue in which it complains of
the date used to mark the beginning of the accrual of prejudgment interest. We
overrule the remainder of the Town's eleventh issue.
VI. Town's Evidentiary Complaints
A. Charts
In its tenth issue, the Town complains that the trial court improperly
overruled the Town's objections to appellees' charts on damages and a time- line
of events because those charts were not relevant and were not properly
authenticated. At trial, the Town did not object to either of these charts based
on lack of authentication. Accordingly, this complaint is waived on appeal. SeeTex.
R. App. P. 33.1(a).
The trial court overruled the Town's objection based on relevance prior to
opening arguments, but the Town does not direct us to a place in the record
where appellees used the charts during their opening statement, nor does the
Town explain how the charts were irrelevant to appellees' case. Thus, the Town's
relevance complaint is waived due to inadequate briefing. Fredonia State
Bank, 881 S.W.2d at 284; Harkins, 999 S.W.2d at 573. In addition,
we note that the trial court sustained the Town's objections to the time-line
chart during trial and the Town did not reurge its relevance objection when
appellees offered the chart on damages into evidence. See Richardson v.
Green, 677 S.W.2d 497, 501 (Tex. 1984).
B. Chief Brungardt
The Town also contends that the trial court improperly overruled its
objections to evidence about whether Chief Brungardt objected to Teague's
investigation of Wess Jones because this evidence is hearsay, irrelevant, and
prejudicial. The complaints of irrelevance and prejudice are waived because they
were not raised at trial. See Tex. R. App. P. 33.1(a).
Regarding the Town's hearsay complaint, Chief Brungardt was the Town's agent
or employee, and his authorization of Teague's investigation into the Wess Jones
incident was in the course and scope of his employment as chief of police.
Accordingly, Teague's testimony that Chief Brungardt did not object to Teague's
investigation of Wess, but actually authorized it, was an admission by a
party-opponent and was not hearsay. See Tex. R. Evid. 801(e)(2)(D); see
also Excel Corp. v. Porras, 14 S.W.3d 307, 314 n.1 (Tex. App.--Corpus
Christi 1999, pet. denied) (holding that statement is admission by
party-opponent if made by party's agent or servant concerning matter within
course and scope of the agency or employment and made during existence of agency
or employment relationship); McEwen v. Wal-Mart Stores, Inc., 975
S.W.2d 25, 28 (Tex. App.--San Antonio 1998, pet. denied) (stating same).
C. Damages Evidence
Next, the Town complains that the trial court improperly overruled the Town's
objections to appellees' damages evidence based on lack of foundation. The
Town's objections that were overruled were merely general objections to
"lack of foundation" that did not specify how the evidence lacked
foundation. These objections did not preserve error because they were not
specific. Tex. R. Evid. 103(a)(1); Seymour v. Gillespie, 608 S.W.2d
897, 898 (Tex. 1980);In re Bates, 555 S.W.2d 420, 432 (Tex. 1977). The
Town also complains, without elaboration, that "the jury's damages are
excessive, and are not supported by admissible evidence." This complaint is
waived because it is not briefed. Tex. R. App. P. 38.1(h); Fredonia State
Bank, 881 S.W.2d at 284.
D. Exclusion of Town's Expert
The Town also asserts that the trial court improperly excluded the Town's
expert on liability from the courtroom under the exclusionary rule. See
Tex. R. Evid. 614; Tex. R. Civ. P. 267. Expert witnesses are not automatically
exempt from the Rule. Drilex Sys., Inc. v. Flores, 1 S.W.3d 112, 118
(Tex. 1999). The Town bore the burden of establishing that its expert was exempt
from exclusion based on one of the exceptions in the Rule. Id. at 117,
119. The Town offered no such evidence; therefore, the trial court did not err
by placing the Town's expert under the Rule.
E. Appellees' Jury Argument
The Town complains that appellees' counsel made incurable jury argument
during closing argument by referring to a police "code of silence" and
by referring to appellees' future earnings and benefits that were unsupported by
the evidence. This complaint is waived because the Town does not cite any legal
authority to support it. Tex. R. App. P. 38.1(h); Fredonia State Bank,
881 S.W.2d at 284. The Town's complaint that the trial court improperly polled
the jury is waived because the Town did not raise this complaint in the trial
court. See Tex. R. App. P. 33.1(a).
We overrule the Town's tenth issue.(21)
VII. Errors in Reporter's Record
In its twelfth and final issue, the Town contends that it is entitled to a
new trial because the court reporter failed to accurately record the proceedings
in this cause. The Town raises the same arguments in this issue that it raised
in its "Objections to Reporter's Record, Motion to Abate Appeal, and Motion
to Correct Reporter's Record," which the Town filed simultaneously with its
appellate brief. We considered and ruled on those arguments when we granted the
Town's motion in part and abated the appeal for correction of the record. Since
that time, a corrected reporter's record has been filed. The Town now contends
that some of the necessary corrections still have not been made and expresses
concern about what matters may be missing from the reporter's record.
An appellant is not entitled to a new trial unless the lost, destroyed, or
inaudible portion of the reporter's record "is necessary to the appeal's
resolution." Tex. R. App. P. 34.6(f)(3). The Town does not explain how the
alleged uncorrected errors are necessary to resolution of the appeal; thus, the
Town has not met its burden under Rule 34.6.
Citing Gillen v. Williams Brothers Construction Co., 933 S.W.2d 162,
164 (Tex. App.--Houston [14th Dist.] 1996, writ denied), the Town
asserts that Rule 34.6 does not require it to demonstrate harm from having an
incomplete record. We decline to apply Gillen to this situation,
however, because Gillen is based on former Rule 50(e), which did not
take into consideration whether the lost, destroyed, or inaudible portion of the
reporter's record was necessary to resolution of the appeal.
(22) We overrule the Town's twelfth issue.
VIII. Conclusion
Having disposed of all of the Town's issues, we reverse the trial court's
award of prejudgment interest and remand that issue to the trial court for a
recalculation of prejudgment interest consistent with this opinion. We affirm
the remainder of the trial court's judgment.

                                                                       
JOHN CAYCE
                                                                       
CHIEF JUSTICE

PANEL A: CAYCE, C.J.; DAY and GARDNER, JJ.

DELIVERED: June 26, 2003

1. A person commits the offense of tampering with or
fabricating physical evidence if, knowing that an investigation or official
proceeding is pending or in progress, he makes, presents, or uses any record,
document, or thing with knowledge of its falsity and with intent to affect the
course or outcome of the investigation or official proceeding. Tex. Penal Code
Ann. § 37.09(a)(2).

 A person commits the offense of tampering with a governmental record if he:
 (1) knowingly makes a false entry in, or false alteration of, a governmental
 record; or (2) makes, presents, or uses any record, document, or thing with
 knowledge of its falsity and with intent that it be taken as a genuine
 governmental record. Id. § 37.10(a)(1)-(2).
 A public servant commits the offense of official oppression if, acting
 under color of his office, he intentionally subjects another to arrest or
 detention that he knows is unlawful. Id. § 39.03(a)(1).

2. There is conflicting evidence about when Welch learned
of Teague's investigation of Wess Jones. Teague testified that he reported the
matter to Welch shortly after he began his investigation. Welch testified that
he first learned of the matter on December 19.
3. Although Wess Jones testified that he changed the
report with Burkett's tantamount approval and Teague's help, and possibly at
Slabotsky's direction, the jury was free to disbelieve Wess Jones's testimony,
believe appellees' testimony, and resolve any inconsistencies in the evidence. See
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986) (holding that trier
of fact may believe one witness, disbelieve others, and resolve inconsistencies
in the testimony of any witness).
4. In light of our holdings regarding appellees' good
faith, we need not consider whether Wess actually violated the law. See
Tex. R. App. P. 47.1;Wichita I, 917 S.W.2d at 785-86.
5. The Act does not protect reports of violations of
internal departmental policy that were not promulgated pursuant to a statute or
ordinance. See Ruiz v. City of San Antonio, 966 S.W.2d 128, 130 (Tex.
App.--Austin 1998, no pet.); see also Grabowski, 922 S.W.2d at 955-56
(holding that deputy's belief that he had reported a violation of law was not
reasonable where the violation was simply that of an internal departmental
policy). Burkett testified that the commission of an illegal act by another
officer or Chief Brungardt was "not an employee grievance."
6. Appellees' suit was, in effect, based on two theories
of recovery. When a party obtains favorable jury findings on two or more
theories of recovery and one of the theories is declared invalid, the party is
still entitled to recover under the other theory. Boyce Iron Works, Inc. v.
S.W. Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988); Durban v. Guajardo,
79 S.W.3d 198, 207 (Tex. App.--Dallas 2002, no pet.); see also Thomas v.
Oldham, 895 S.W.2d 352, 359-60 (Tex. 1995) (overruling appellant's
no-evidence challenge where appellant did not object to broad-form submission or
challenge legal sufficiency of evidence to support entire verdict).
7. Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378
(Tex. 2000) and Harris County v. Smith, 96 S.W.3d 230 (Tex. 2002) do
not apply here because the Town did not object to the broad-form submission of
the liability question, nor did it object to the question on the basis that it
included a ground that was unsupported by the evidence. See Casteel, 22
S.W.3d at 389 (reversing for new trial where single broad-form liability
question commingled valid and invalid liability grounds, appellant objected to
question, and court could not determine whether jury based its verdict on
invalid theory); see also Smith, 96 S.W.3d at 234 (applying Casteel
to broad-form damages question that included elements of damages for which there
was no evidentiary support, where appellant timely and specifically objected to
question).
8. "Appropriate law enforcement authority" is
defined in the Act as an authority who is a part of a state or local
governmental entity or of the federal government that the employee in good faith
believes is authorized to: (1) regulate under or enforce the law alleged in the
report to have been violated; or (2) investigate or prosecute a violation of
criminal law. Tex. Gov't Code Ann. § 554.002(b). The determination of who is an
appropriate law enforcement authority is a question of law. Neeham, 82
S.W.3d at 318.
9. Police officers and district attorneys are appropriate
law enforcement authorities because they are authorized to investigate or
prosecute violations of criminal law. See Tex. Gov't Code Ann. §
554.002(b)(2); see also Tex. Code Crim. Proc. Ann. arts. 2.01, 2.12(3),
2.13 (Vernon Supp. 2003) (setting out duties of district attorneys and peace
officers).
10. See slip op. at 17-20 (discussing why
appellees' failure to meet their burden of proof with regard to Chief Brungardt
does not defeat their whistleblower claim).
11. The record does not support the Town's assertion that
appellees had also been the subject of a no-confidence vote.
12. The Town relies on McDill to support its
contention that the trial court should have included the Town's requested
language in the charge. 914 S.W.2d at 724. The Town's reliance on McDill
is misplaced, however, because the Town's requested instruction is different
from the one in McDill. In fact, the instruction that the McDill
court concluded was proper was virtually identical to another instruction the
court in this case included in its charge. See id.
13. An inferential rebuttal issue is one that seeks to
disprove the existence of an essential element submitted in another issue. Its
basic characteristic is that it presents a contrary or inconsistent theory from
the claim relied upon for recovery. Tex. Workers' Comp. Ins. Fund v.
Mandlbauer, 988 S.W.2d 750, 752 (Tex. 1999).
14. The trial court instructed the jury as follows:

 You are instructed that if the Town of Flower Mound would have taken the
 same action with respect to Plaintiffs Tom Teague and/or David Burkett without
 consideration of Plaintiffs' "whistleblowing" activity, if any such
 activity occurred, then the Town of Flower Mound may not be held liable for
 any violation of the Texas Whistleblower Act, including the retaliation
 referred to in these questions.

15. See slip op. at 19-20.
16. The Town's proposed instruction was as follows:

 You are instructed that the term "adverse personnel action" must
 be an action which is an ultimate employment decision that affects the terms
 and conditions of employment, and which causes some injury or harm to the
 Plaintiff such as discharge, demotion, refusing to hire or promote, or a
 reprimand, or a decision constituting a change in benefits, or reassignment. There
 is evidence that Plaintiffs Tom Teague and David Burkett were placed on
 administrative leave with pay, and you are instructed that such action does
 not constitute "suspension" or "adverse personnel action"
 under the Whistleblower Act. [Emphasis supplied.]

17. Regarding liability, the charge asked the jury:

 Was the Town of Flower Mound's decision to terminate the employment of Tom
 Teague because of Tom Teague's good faith allegations, if any, against Wess
 Jones and his complaint against Chief Burngardt [sic] for the alleged Wess
 Jones cover-up?

The charge included an identical liability question regarding Burkett. The
only objection that the Town made to these liability questions was that they did
not ask whether appellees made their report to an appropriate law enforcement
authority. For the reasons stated above, the trial court did not err in
overruling this objection.
18. See slip op. at 12-28.
19. The Amarillo Court of Appeals has held that the trial
court has the discretion to award prejudgment interest from the date suit is
filed in federal court. Excel Corp. v. Apodaca, 51 S.W.3d 686, 701-02
(Tex. App.--Amarillo 2001), rev'd on other grounds, 81 S.W.3d 817 (Tex.
2002). The issue before the Amarillo court, however, was whether the trial court
abused its discretion by awarding prejudgment interest for periods of delay
caused by the plaintiff's filing of his lawsuit in federal court. Id.
at 701. The meaning of "the date the suit is filed" was not an issue
in Apodaca.
20. The Town also complains that the "type" of
calculation the trial court used to arrive at prejudgment interest was improper.
If this is a complaint about the rate of prejudgment interest, we note that
prejudgment interest accrues at the same rate as post-judgment interest and is
to be computed as simple interest. Johnson & Higgins, 962 S.W.2d at
532. The Town does not explain how the trial court used an incorrect interest
rate when it originally calculated appellees' prejudgment interest, and we are
confident that the trial court will apply the proper interest rate on remand.
21. In light of our holdings with regard to the Town's
first, second, fourth, fifth, and tenth issues, we need not consider the Town's
ninth issue, in which it complains that the trial court improperly overruled its
motion for new trial.
22. Former Rule 50(e) provided, in pertinent part:
"If the appellant has made a timely request for a statement of facts, but
the court reporter's notes and records have been lost or destroyed without
appellant's fault, the appellant is entitled to a new trial unless the parties
agree on a statement of facts." Tex. R. App. P. 50(e), 707-708 S.W.2d (Tex.
Cases) LXII-III (1986, revised 1997).